513-12/DPM/MAM
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Petitioner
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Don P. Murnane, Jr.
Manuel A. Molina

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NAVIG8 CHEMICALS POOL INC., <br><br>       Petitioner, <br> - against - <br><br> GUSTAV HEESS OLEOCHEMIE GmbH, <br><br>       Respondent. | **12 Civ __ (    )** <br><br><br> **PETITION TO COMPEL ARBITRATION PURSUANT TO <u>9 U.S.C. §§ 1 – 307</u>** |

   Petitioner, NAVIG8 CHEMICALS POOL INC. (hereinafter "Navig8"), by its attorneys Freehill Hogan & Mahar, LLP, as and for its Petition against Respondent, GUSTAV HEESS OLEOCHEMIE GmbH (hereinafter "Respondent"), alleges upon information and belief as follows:

<u>**JURISDICTION**</u>

   1.  This Petition to compel arbitration is made pursuant to 9 U.S.C. § 1 *et seq.*, in accordance with the parties' written agreement to arbitrate at New York.

   2.  This is a maritime and admiralty action within the jurisdiction of the United States District Courts (28 U.S.C. § 1333) and within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

394155.1

## THE PARTIES

3.      Petitioner Navig8, at all times hereinafter mentioned, was and still is a foreign business entity organized and existing under the laws of the Marshall Islands, with an office and place of business at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960.

4.      Respondent, at all times hereinafter mentioned, was and still is a legal entity duly organized and existing under the laws of Germany, with an office and place of business at An der Beek 255 (Gewerbegebiet), 41372 Niederkrüchten-Elmpt, Germany.

## THE NATURE OF THE PARTIES' DISPUTE

5.      On or about May 18, 2010, Navig8, as Disponent Owners of M/T SONGA EMERALD, and Respondent, as Charterer, entered into a contract of carriage on an amended VEGOILVOY charter party form ("Charter Party"). (See Exhibit A.) The Charter Party stipulated the carriage by Navig8 of "Min 2000 1 GRADE CASTOR OIL with 5% More in CHOPT [Charterer's option]" from Kandla, India to Rotterdam, the Netherlands.

6.      The Charter Party also provided for the arbitration of all disputes in New York. Part II, Clause 31 of the VEGOILVOY tanker voyage charter party form expressly states in pertinent part as follows:

> 31. ARBITRATION. Any dispute arising from making, performance or termination of this Charter Party shall be settled in New York, Owner and Charterer each appointing an arbitrator, who shall be a merchant, broker or individual experienced in the shipping business; the two thus chosen, if they cannot agree, shall nominate a third arbitrator who shall be an Admiralty lawyer. Such arbitration shall be conducted in conformity with the provisions and procedure of the United States Arbitration Act, and a judgment of the Court shall be entered upon ay award made by said arbitrator. Nothing in this clause shall be

deemed to waive Owner's right to lien on the cargo for freight, dead freight or demurrage.

(See Exhibit A, Charter-Party, Printed Form Part II, Clause 31.)

7.     Pursuant to the Charter Party terms, Respondent was allowed one day seventeen hours and forty minutes of reversible laytime to perform all loading operations at Kandla as well as all discharge operations at Rotterdam.   Respondent, however, completed the loading and discharge operations for subject the voyage from Kandla to Rotterdam in five days, two hours, and three minutes.

8.     Any time in excess of the allowable time to complete all cargo loading and discharge operations constituted demurrage for which Respondent would be liable to Navig8, as per the terms and conditions of the Charter Party. [1]

9.     By virtue of the foregoing, Respondent incurred a total time on demurrage of three days, eight hours, twenty-three minutes stemming from the loading and discharge operations undertaken by Respondent, demurrage for which Respondent is liable to Navig8.

10.     In accordance with the Charter Party, demurrage is to be paid at a rate of "USD 15,000 PDPR [per day pro rata.]" (See Exhibit A, Fixture Recap.)  As a result, Respondent was liable to Navig8 in the sum of $50,239.58.

11.     On August 3, 2010, Navig8 sent Invoice No: N8CHEM17/641 to the Respondent seeking payment of $50,239.58, which represented the demurrage incurred during the Charter-Party's subject voyage. (Exhibit B annexed hereto.)

12.     Although duly demanded, Respondent has thus far refused to pay the demurrage to Navig8.

---

[1] Demurrage is "[l]iquidated damages owed by a charterer to a shipowner for the charterer's failure to load or unload cargo by an agreed time." *Black's Law Dictionary* (9th ed. 2009).

13.     On August 6, 2012, Navig8, pursuant to Clause 31 of the Charter Party, formally demanded arbitration at New York, concomitantly appointing its arbitrator and requesting that Respondent nominate an arbitrator. (Exhibit C annexed hereto.)

14.     As Respondent ignored the August 6, 2012 arbitration demand and otherwise failed to pay the demanded demurrage, Navig8, on September 10, 2012, again requested in writing that Respondent appoint an arbitrator, as per the requirements of Clause 31 of the Charter Party. (Exhibit D annexed hereto.).

15.     To date, the Respondent has not appointed an arbitrator nor responded in any way to Navig8's demand for arbitration.

## RELIEF REQUESTED

16.     Navig8 and Respondent were parties to a maritime contract that provides for all disputes arising from its performance to be settled by arbitration in New York. (See Exhibit A, Charter Party, Part II, Clause 31.)

17.     Navig8 and Respondent are contractually bound to arbitrate the demurrage claim which is the subject of this Petition.

18.     Navig8 has demanded New York arbitration and the written arbitration demand was duly made upon and delivered to the Respondent. (See Exhibit C.)

19.     Navig8 has duly performed all of its obligations in accordance with the terms and conditions of the governing Charter Party.

20.     Respondent, in violation of its contractual obligations to arbitrate under the Charter Party and the Federal Arbitration Act, has wrongfully ignored Navig8's arbitration demand.

394155.1

4

21.     Respondent is required to appoint its arbitrator, pursuant to the terms and conditions of the Charter Party's Arbitration Clause and the Federal Arbitration Act, but has failed to nominate any arbitrator to date. Accordingly, Navig8 respectfully requests that the Court direct the Respondent to proceed immediately to arbitration as required by the Charter Party.

22.     Respondent's failure to comply with the unequivocal agreement of the parties to arbitrate has necessitated the making of this application. Accordingly, Navig8 requests that it be awarded the costs and attorneys' fees incurred in making this Petition.

23.     No previous application has been made to this Court or any other Court or Judge, for the relief sought herein.

WHEREFORE, Petitioner prays in accordance with the provisions of the Federal Arbitration Act, that this Honorable Court enter an Order:

(1)     directing that Respondent proceed with arbitration in accordance with the contract of carriage, including the Charter Party, dated May 18, 2010;

(2)     directing that Respondent, within twenty (20) days of this Court's order, appoint an arbitral nominee in accordance with the requirements of the Charter Party's Arbitration Clause, failing which, Navig8 will be permitted to appoint a second arbitrator on Respondent's behalf;

(3)     awarding Navig8 the costs and attorneys' fees for this Petition and such other and further or different relief as the court may deem just and proper in the circumstances.

Dated: New York, New York
       December 21, 2012

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Petitioner

By: _____
       Don P. Murnane, Jr.
       Manuel A. Molina

# EXHIBIT A

**From:** MSS [mailto:mss@maansmarine.com]
**Sent:** Wednesday, May 19, 2010 2:53 AM
**To:** Navig8 Chemicals - Chartering
**Cc:** mss@maansmarine.com
**Subject:** M/T SONGA EMERALD / GUSTAV HEESS CLEAN FIXTURE

REVISED  (with cargo name inserted)

WE ARE PLEASED TO RECAP THE FOLLOWING FIXTURE WHICH IS CLEAN AND WITHOUT SUBJECTS

CP DATE : 18th May 2010

- VESSEL : M/T "SONGA EMERALD" OOS (Q88 attached)
  FLAG/MARSHALL ISLAND, BUILT/2009 JUL 8TH
  CLASS/KR
  GT/11259, NT/5265, DWT/17,566.822
  LOA/144.063, BREADTH/22.6, DRAFT/9.214

- CHARTERER : Gustav Heess Oleochemie GMBH
              An der Beek 255 (Gewerbegebiet)
              41372 Niederkrüchten - Elmpt

- Disponent Owner: Navig8 chemicals Pool inc.

- LAYCAN : 25 - 30 May 2010

- Cargo : Min 1500 1 GRADE CASTOR OIL with 5% More in chopt

- Load Port : 1SP / 1SB KANDLA

- Disch Port : 1SP / 1SB or Safe anchorage/ buoy moorings ROTTERDAM

- Freight : USD 83 pmt basis 1/1

- FREIGHT PAYABLE 10 BANKING DAYS AFTER S/R/L FREGHT AS PER CHARTER PARTY OR FREIGHT PAYABLE AT DESTINATION BLS

- LAYTIME    : 80MTPH SHINC/Local Holidays (as per Kandla port trust) excluded UU for loading; NOR to
              be tendered at Kandla between 08:00hrs to 20:00hrs Mon to Sun
              120 MTPH SHINC for discharge at Rotterdam.
              Laytime to be reversible


- DEMURRAGE :  USD 15,000 PDPR

- TTL COMM. 2.5% TO MSS Chartering Pte. Ltd. on F/D/D payable by Owners

Last 3 cargoes: Lubes
reformate +/ fatty acid methyl ester +/ c6 +/ bs200 base oil
c6 +/ molasses +/ fatty acid methyl ester +/ gasoline

Vessel itinerary:

ETA Karachi 21st am
ETD 22nd am
ETA Dahej 23rd pm
ETD 25th am
ETA Sikka 26th am
ETD 27th am
ETA Kandla 27th pm
ETA ARA 18-23 June

AWRP / FREIGHT TAX / PREWASH FOR Owners ACCOUNT

CP : VEGOILVOY WITH CHARTERERS TERMS WITH BELOW AMENDMENTS

2. Delete 2nd sentence

3. Add to the end of the first paragraph " No wall wash will be required for this voyage.  If after 3 tank inspections the tanks are not sufficiently clean, the c/p is to be mutually cancelled without liability to either party"

6. b. after "within local office hours" insert in 'in Kandla only"
        Delete "actual loading time used to count" and insert "time to count from vessel arriving all fast at berth"

7. Add to the end "A draft of alll Bills of Lading to be presented to owners for approval before they will be released"

9.  add at the end "weather and safe navigation permitting"

11. delete "or before breaking bulk, whichever is later"

13. delete "nautical reasons as well as"
        Bullet point 3: add at the end "of vessels officers or crew"

16. Amend to read - Pumping Clause : The vessel shall be equipped with suitable pumps, pipes, couplings, flanges, reducers, tools, tackles etc and also that they are absolutely clean and in perfect working order for handling the cargo.  The Ship should be able to maintain average discharge rate of 200 MT/hour or an average working pressure of 7 KG/CM2 at the manifold provided shore facilities permit

Cancellation Clause
If it becomes apparent that the vessel will not arrive at the load port prior to canceling date, charterers have the option within 48 hours after receipt of such notice either to maintain the charter or cancel it without penalty to either party.  If charterers do not cancel the charter within the prescribe time after receipt of owners notice, the charter party is maintained on the basis of the new canceling date proposed by the owners.


END  RECAP

-----

Best Regards
Ashok Pillai
MSS Chartering
Tel:  +91-22-40169543
Fax: +91-22-26730619
mss@maansmarine.com

## Standard charter party terms

**Special provision clause**: the special provisions clauses, as attached, are deemed to be part of this charter party. These special provisions are to govern in the event there is a conflict between these clauses and the printed provisions of VEGOILVOY form

1. Owners warrant that the vessel and its equipment complies with all mandatory international regulations being in force at the date of this charter party applicable to the contracted voyage and cargo and that the vessel has onboard the necessary valid certificate.

2. Vessel to be classed with IACS member for all the time she will be under this charter party. Any extra insurance on the ship, if any on the account's of vessel's age and/or class and/ or flag and/or ownership to be for owner's account.

3. Cleaning clause: Vessel's tanks, pipes and pumps to be thoroughly cleaned and deodorised for
   vegetable oils and fit to receive the same, to Charterers/Shippers Inspectors satisfaction, and to Surveyors approval, on arrival at the first, or sole, Loadport named in this Charter Party. Should the vessel fail to pass the first tank inspection by Charterers/Shippers Surveyor, the costs for all subsequent inspections to be for Owners account. If vessel fails to pass inspection, Charterers shall have the option of cancelling this Charter Party
   without liability to either party. Cleaning always to be for Owner's account. Time used for cleaning/deballasting not to count as laytime, and laytime to count only after tanks passed and accepted by Charterers

   Cargo segregation: the cargoes loaded under this charterparty shall be kept entirely segregated from other cargoes on board the vessel during loading, voyage and discharging.

4. Last cargoes
   Owner's warrant that last 3 cargoes have been clean/unleaded, max 2,5 npa.

   Master to issue and sign 'FOSFA International Combined Master's Certificate' in the form in force at the date of the Bill of Lading stating that the last cargo(es) in the tank(s) receiving the oil, and in addition stating that the immediate previous cargo in the tank(s) receiving the oil, has not been a product appearing on the FOSFA International list of banned previous cargoes, as in force at the time of B/L date.
   Master to certify same in writing to Charterers and/or Charterers' representative at load port prior to loading.

5. Notices : owners/master to give agents/charterers 96 hrs / 72 hrs / 48 hrs / 24 hrs / 12 hrs eta notices at loadport and discharge port where applicable. Owner's to keep Charterers and posted immediately of any changes in vessel's ETA/itinerary.  Charterers are not responsible for any delays to vessel berthing due to failure of owners to give the the required notices.

6. Commencement of laytime
   a) Owner to tender NOR only when vessel has completed all formalities and is fit for loading in all respects.

   b) 6 hours notice each port, unless used. N.O.R to be tendered within local office hours (1000 hrs to 1700 hrs) (monday to friday and saturday upto 1300 hrs) and time to count six (6) hours thereafter unless used at loadport in which case actual loading time used to count.

7. B/L's
   A full set of three original Bills of Lading to be signed by Master, or Master to give Charterers Agents letter confirming and/or authorising vessel's Agents to sign Bills of Lading on his behalf, always in accordance with the mates receipts. Agents to release Bills of Lading immediately on presentation of mates receipt. In case original Bills of Lading are not available at time of discharge at the port of destination Owner's are obliged to discharge cargo
   into bonded tank. If Charterers require any other action than above, Charterers are to supply Owner's with a letter of indemnity as per Owner's P and I Club wording, without a bank guarantee, as to the disposal of the cargo.

8. Heating
   Master to issue Certificate that tanks loaded are with heating coils and the temperature will be maintained as advised by the Charterers, or Charterers nominees. Charterers specific heating instructions as follows: -
   Cargo to be loaded at a temperature not exceeding 35 degrees centigrade. Owner's to instruct Master to maintain loaded temperature, and in sufficient time prior to arrival at discharge port, Master should increase temperature gradually with max 5 deg. Celsius per day to achieve 40/42 deg. Centigrade upon arrival at discharge port. Such temperature to be maintained during discharge and vessel to supply Charterers with heating report.
   Owners to ensure that the above instructions are strictly adhered to and correctly recorded.

9. Completion/Rotation
   If this Charter Party is for a part cargo Owner's have the option of completing the vessel at port of loading, or other port(s), enroute to discharging port named in this C/P, but other cargoes are to be kept strictly segregated.
   Enroute to be understood as a natural geographical rotation from the port(s) of shipment to the port(s) of destination.

10. All details of this fixture are to remain strictly private and confidential.

11. Freight payment clause: freight is payable in US dollars by telegraphic transfer within 10 banking days after completion of loading or before breaking bulk whichever is later, after charters receive the signed freight invoice by fax or E mail.

12. Any dues and/or taxes on cargo for Charterers' account. Any dues and/or taxes on vessel and/or freight, including Indian income tax on freight, to be for Owner's account. Owner's to be responsible for usual port expenses including wharfage, dockage quay dues and berth hire costs at load/discharge port/s.

13. Berthing/double banking delays due to nautical reasons as well as defects, repairs etc at ship's side shall be deemed beyond charterer's control and shall not count as used lay time. Any waiting time for the tide and time lost due to restrictions of night operations/ navigation, will not count as used lay time. Time shall not count as lay time when used/lost for the following reasons:
    - On inward passage from anchorage to loading/discharging berth.
    - Due to any delay and/or failure and/or inefficiency of the vessel or its officer/crew.
    - As a result of lockout, strike, stoppage or restraint of labour.
    - In handling slops and/or in deballasting and/or ballasting unless concurrent with cargo operation.

14. In case if vessel is undertaking operations for other charterers also and terminal is unable to concurrently load/discharge charterers cargo then laytime will commence only at commencement of cargo operations for charterers cargo but not later than cargo completion time of other charterers cargo.

15. Simultaneous load/discharge- If vessel loads/discharges cargo for other Charterers at same berth(s), all time including waiting time, time used and/or time on demurrage if any, is to be prorated in accordance with the respective cargo quantities of each Charterer. Where waiting time, time used and/or time of demurrage results from the act of any specific Charterer, such time will be attributed to such Charterer.

16. Pumping Clause : The vessel shall be equipped with suitable pumps, pipes, couplings, flanges, reducers, tools, tackles etc and also that they are absolutely clean and in perfect working order for handling the cargo
The Ship should be able to maintain average discharge rate of 250 MT/hour provided shore facilities permit. The vessel shall ensure that an average working pressure of 7 KG/CM2 is available at tanker's manifold.

17. Wherever, as per this charter party terms, the laytime is not to be counted as 'used laytime' the same should also not be counted as ' time on demurrage' even when the vessel is on demurrage.

18. Demurrage time bar clause: any demurrage claim shall be deemed to be waived and absolutely barred, if it is not received by supplier / charterer in writing with supporting documents within 60 90 days after completion of discharge.

19. Owner's undertake that the vessel has not been sold for scrapping or change Ownership during the currency of this Charter Party and Owner's guarantee performance of this Charter Party.

20. Force Majeure: the inability of either party to meet its obligations hereunder if occasioned by an event or condition of force majeure shall not subject such party to any liability for breach of the terms thereof. For the purposes of this charter party, Force Majeure shall mean without limitation, war, flood, cyclone damage, strike, breakage of major equipment, major accidents, riots, action of governmental authority, or any other event or act of god beyond the reasonable control of the party affected which prevents the material performance by such party of its obligations hereunder.

21. ISM / ISPS clause : Standard BIMCO ISM / ISPS Clause to apply.

VEGOILVOY  1/27/50

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

CHARTER PARTY made as of                   , 19   at

by and between

(hereinafter called the "Owner") of the good                    MS/SS

(hereinafter called the "Vessel") and

Charterer (hereinafter called the "Charterer" ).

    The Vessel shall receive from the Charterer or supplier at the port or ports of loading, or so near thereto as she may safely get, always afloat, the cargo described in Part I, for delivery as ordered on signing bills of lading to the port or ports of discharge, or so near thereto as she may safely get always afloat; and there discharge the cargo; all subject to the terms, provisions, exceptions and limitations contained or incorporated in this Charter Party, which shall include the foregoing preamble and Parts I and II. In the event of a conflict, the provisions of Part I shall prevail over those contained in Part II to the extent of such conflict.

    Each of the provisions of this Charter Party shall be and be deemed severable, and if any provision or part of any provision should be held invalid, illegal or unenforceable, the remaining provisions or part or parts of any provisions shall continue in full force and effect.

## PART I

A.    Description and Position of Vessel.

    Net Registered Tonnage:

    Total Deadweight:        tons of 2,240 lbs. each on        draft in salt water on assigned summer freeboard.

    Capacity for cargo:        bbls. of 42 American gallons each at 60deg F. or        tons of 2,240 lbs. each (10% more ore less, Vessel's option.

    Classed:            Now:

B.    Part-Full Cargo.

    If this Charter Party is for a full cargo, then it shall be the quantity the Vessel can carry if loaded to her minimum permissible freeboard for the voyage, but not exceeding what the Vessel can, in the Master's judgment, reasonably stow and carry over and above her tackle, apparel, stores, and furniture, sufficient space to be left in the expansion tanks to provide for the expansion of the cargo. In no event shall Charterer be required to furnish cargo in excess of the quantity stated as the Vessel's capacity for cargo plus 10% of that quantity. If less than a full cargo is to be carried, the quantity stated shall be the minimum quantity which the Charterer is required to supply.

C.      Loading Port.


        Readiness Date:                                    Cancelling Date:

D.      Discharging Port.

                        .


E.      Total Laytime
                                                   for loading;
                                                   for discharging
        ( Running Hours.)

F.      Freight Rate.



        Freight Payable at:

G.      Demurrage per Hour.


H.      Special provisions.



IN WITNESS WHEREOF the parties hereto have executed this agreement, in duplicate, as of the day and year first above written.

Witness to signature of:

                                        By:


Witness to signature of:

                                        By:

# PART II

WARRANTY.    (a)  The Owner shall, before and at the commencement of the voyage, exercise due diligence to make the Vessel seaworthy, properly manned, equipped, and supplied for and during the voyage, and to make the pipes, pumps, and heater coils tight, staunch, and strong, in every respect fit for the voyage, and to make the tanks, holds, and other spaces in which cargo is carried fit and safe for its carriage and preservation.

(b)  It is understood that if the tank or tanks, into which the particular cargo covered by this Charter is to be placed, upon testing prove to be defective the Owner undertakes to execute the necessary repairs, provided repairs can be effected within 24 hours and at reasonable expense; otherwise, Owner has the option of cancelling this Charter in which case no responsibility shall rest with the Vessel, Owners, or Agents.

2.   TIME FOR READINESS OF CARGO. Charterer warrants that the cargo shall be available for loading at the designated loading port upon arrival of the Vessel within the Readiness and Cancelling date shown in Part I hereof. Any delay suffered by the Vessel for failure to conform to this warranty shall count as used lay time.

3.   READINESS AND CANCELLING DATE. Laytime shall not commence before the readiness date named in Part I, unless otherwise provided in this Charter, or unless the Charterer accepts a notice of readiness or orders or permits the Vessel to berth before that date, or otherwise waives the provisions of this paragraph. If the Vessel is not ready to load by 4.00 p.m. (local time) on the cancelling date named in Part I, the Charterer shall have the option of cancelling this Charter by giving the Owner notice of such cancellation within twenty-four (24) hours after the cancelling date; otherwise this Charter shall remain in full force and effect. The Charterer may in its notice of cancellation specify that it will nevertheless accept the Vessel if she is ready to load on or before a date or time that Charterer may designate in such notice in which event the Owner may at its option either treat this Charter Party as cancelled or tender the Vessel on or before the date named by the Charterer in its notice, whereupon this Charter shall remain in full force and effect.

4.   NOTICE OF READINESS AND COMMENCEMENT OF LAYTIME. (a) When the Vessel has arrived at the port of loading or discharge and is ready to load or discharge, a notice of readiness shall be tendered to the Charterer or its agent by the Master or Agent by letter, telegraph, wireless or telephone. The Vessel shall be deemed ready within the meaning of this clause whether she arrives during or outside of usual business hours, whether she is in or out of berth or whether or not she has ballast water or slops in her tanks. Laytime shall commence either at the expiration of six (6) running hours after tender of notice of readiness, Vessel in or out of berth, except that any delay to the Vessel in reaching her berth caused by the fault of the Vessel or Owner shall not count as used laytime; or immediately upon the Vessel's arrival in berth (i.e. finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf) with or without notice of readiness, whichever first occurs.

(b)  Notwithstanding anything contained in paragraph (a) of this clause, laytime shall commence when the Vessel arrives at the loading or discharging port, whether or not berth is available; provided that notice of readiness shall always be tendered as therein stipulated.

5.   LAYTIME.   (a)  The number of running hours specified as laytime in Part I shall be permitted the Charterer for loading, discharging, and used laytime; but any delay due to breakdown or inability of the Vessel's facilities to load or discharge the cargo within the time allowed shall not count as used laytime. If regulations of the Owner prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee, or the port authorities prohibit loading or discharging at night, time so lost shall count as used laytime. The Vessel shall have the right to sail from all ports immediately upon the completion of loading or discharging whether or not laytime has expired.

(b)  Where commingled shipments, or separate shipments, are loaded or discharged concurrently at the same installation, the laytime allowed to each shipper shall be the gross number of hours allowed any of the commingled or separate shipments, it being conclusively presumed that loading and discharging of all such shipments shall commence simultaneously.

6.   SAFE BERTH. SHIFTING.         (a)   If under Part I hereof the Charterer is given the right to name the loading and discharging berth, the Vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided that the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer.

(b)  If under Part I hereof the Charterer is given the right to load or discharge at more than one berth, the Charterer shall arrange with the agent of the Vessel for shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to the next berth, charges for running lines on arrival at and leaving that berth, wharfage and dockage charges at that berth, additional agency charges and expense, Customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time lost to the Vessel on account of shifting shall count as used laytime.

(c)  Notwithstanding anything contained in paragraphs (a) and (b) of this clause, the Charterer warrants that the cargo shall be discharged at the ports and berths specified in Part I. Any change in loading or discharging ports or berths shall be made only as the result of special agreement in writing between Charterer and Owner, and in such case, Charterer shall assume all cost incident to such change, including the value of the vessel's time if the voyage is prolonged thereby.

(d)  Lighterage. Lighterage at port of loading shall be at the risk and expense of Charterer. The Charterer shall deliver cargo to alongside Vessel as instructed by Owner, and the Owner shall provide a berth immediately alongside the Vessel for the barge or barges carrying the cargo after which pumping shall commence and proceed continuously.

7.   PUMPING IN AND OUT. HOSES.(a)   The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or consignee. The Vessel shall furnish

her pumps and the necessary steam for discharging in all ports where the regulations permit of fire on board, as well as necessary hands. Should regulations not permit fires on board, the Charterer or consignee shall supply, at its expense, all steam necessary for discharging as well as loading, but the Owner shall pay for steam supplied to the Vessel for all other purposes. If cargo is loaded from lighters, the Vessel, if permitted to have fires on board, shall, if required, furnish steam to lighters at Charterer's expense for pumping cargo into the Vessel.

(b)   Hoses--All hose (suitable to fit Vessel's connection) and other necessary equipment and labor to accomplish delivery of cargo to be provided by Charterer at Charterer's risk and expense.

(c)   Stevedoring--If stevedoring is required, it is to be arranged and paid for by the Charterer.

(d)   Steam--Vessel to furnish steam at its expense for the operation of receiver's pumps at port of discharge.

(e)   Squeegeeing--Squeegeeing to be paid by the Owner and time used is not to count as used laytime.

(f)   When shipments are commingled before loading--The cargo to be carried pursuant to this Charter Party has been or will be commingled with cargo belonging to other Charterers prior to loading, and will be loaded into the tanks of the Vessel without separation or identification. Neither the Vessel nor Owner assumes any responsibility for the consequences of such commingling, nor for separation of the several consignments at the time of delivery. The Vessel undertakes to deliver only that proportion of the cargo actually loaded in the designated tanks which is represented by the percentage that the amount specified in the Bill of Lading issued for the cargo covered by this Charter Party bears to the total of the commingled shipments delivered at destination.

(g)   When shipments are to be commingled upon loading in the tanks of a vessel--It is understood that the Vessel will carry cargoes supplied by other Charterers to be carried subject to the terms of substantially similar part-cargo charter parties. Where the products are similar, the Vessel shall have the right to commingle such products in the tanks of the Vessel, in which case the Vessel undertakes to deliver only that proportion of the cargo actually loaded in the designated tanks which is represented by the percentage that the total amount specified in the bill of lading bears to the total of the commingled shipments delivered at destination. Neither the Vessel nor Owner assumes any responsibility for the consequences of such commingling, nor for the separation thereof at the time of delivery.

(h)   Unless notation or exception is made in writing on the bill of lading, or other shipping document before departure of the vessel from the dock or place at which the said cargo is delivered, receipt of the cargo shall be deemed prima facie evidence of right delivery of the entire cargo as described in the bill of lading; further, that upon failure or refusal by the Charterer or its representative to execute or except to the ullage reports prepared by the vessel, the figures stated in said ullage reports shall be deemed prima facie correct and binding upon the parties hereto.

8.   PRODUCTS EXCLUDED, FLASHPOINT.   (a)   No product shall be shipped which fails to meet one or the other of the two following requirements: (1) The vapor pressure at one hundred degrees Fahrenheit (100deg. F.) shall not exceed thirteen pounds (13 lbs.) as determined by the A.S.T.M. Method (Reid Method) identified as D-323 current at the time shipment is made. (2) The distillation loss shall not exceed four per cent (4%) and the sum of the distillation loss and the distillate collected in the receiving graduate shall not exceed ten per cent (10%) when the thermometer reads one hundred twenty-two degrees Fahrenheit (122deg. F.). Note.--The distillation test shall be made by A S.T.M. Method identified as D-86 current at the time shipment is made. When products other than Naphtha or Gasoline are tested, the distillation loss may be determined by distilling not less than twenty-five per cent (25%) and deducting from one hundred per cent (100%) the sum of the volumes of the distillate and the residue in the flask (cooled to a temperature of sixty degrees Fahrenheit (60deg. F.)).

(b)   No petroleum or its products having a flashpoint under 150 deg. Fahrenheit (Closed Cup Abel Test) shall be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off crude oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

9.   FREIGHT.   (a)   Full freight to the discharging port named in Part I or declared by the Charterer in accordance with this Charter shall be completely earned on all cargo as loaded and the Owner shall be entitled to receive and retain such freight irrevocably under all circumstances whatsoever ship and/or cargo lost or not lost, whether or not the cargo is damaged or unsound, or in the event the voyage is abandoned or broken up.

(b)   The freight shall be at the rate stipulated or incorporated in Part I based on the intake quantity as shown by the Inspector's Certificate of Inspection, the services of the Inspector to be arranged and paid for by the Charterer who shall furnish the Owner's Agent with a copy of the Inspector's Certificate.

(c)   Freight, less any advances made to the Master at the port or ports of loading, shall, unless otherwise agreed in Part I, be paid in full without discount in United States currency to the Owner's Agent at the Agent's place of business upon receipt by the Agent of figures indicating the quantity of cargo loaded as provided in sub-paragraph (b) above. No deduction in freight shall be made for water and/or sediment contained in the oil.

10.   DEADFREIGHT. Charterer will load as much oil as, in the opinion of the Master is required to fill the tank or tanks (whether such quantity be less than or in excess of the tonnage stated in Part I hereof), failing which Charterer shall pay deadfreight on the quantity short of Master's requirements, or if, as a result of the Charterer's failure to deliver on board the quantity required by the Master, there is in the tank or tanks not sufficient to render it, in the opinion of the Master, safe for the voyage, he shall be at liberty to require Charterer to remove the oil loaded at Charterer's expense and risk and Charterer agrees to pay deadfreight at the rate per ton stipulated in Part I hereof on the full oil capacity of the tank or tanks.

11.   DEMURRAGE.   (a)   Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate stipulated in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge because of fire or explosion in or about the plant, or because of breakdown of machinery or loading or discharging facilities of the Charterer, shipper or consignee of the cargo,

the rate of demurrage shall be reduced to one-half the rate stipulated in Part 1 hereof per running hour and pro rata of such reduced rate for part of an hour for demurrage so incurred.

    (b)    Where commingled or separate shipments are loaded or discharged at the same installation, demurrage shall be apportioned among such shipments in proportion to the ratio which each bears to the aggregate thereof; provided, however, that where the cause of the delay results from the act of any specific charterer or shipper, the total demurrage on the vessel shall be charged against such charterer or shipper and such shipment.

    (c)    Dispatch--No dispatch money shall be payable under this Charter Party .

    12.    DUES, WHARFAGE, TAXES. The vessel shall be free of any wharfage, dockage, quay dues or similar charges at all loading and discharging ports. Entrance and clearance fees whether measured by the volume of cargo or not, towing and tug charges, pilotage, dues, and other usual port charges on the Vessel shall be paid by the Owner. All other dues, taxes, assessments, and charges on the cargo shall be paid by the Charterer including but without limitation any habilitation tax, Customs overtime, taxes on freight at loading or discharging ports as well as any unusual taxes, assessments or governmental charges whether in effect at present or whether imposed on the Vessel or freight in the future and whether or not measured by the volume of the cargo, shall be paid by the Charterer

    13.    ICE. The Vessel shall not be ordered to or bound to enter any ice-bound port or place or any place where lights, lightships, marks or buoys on Vessel's arrival are or are likely to be withdrawn by reason of ice or where there is risk that ordinarily the Vessel will not be able on account of ice to enter, reach or leave the place. The Vessel shall not be obliged to force ice. If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in and/or damaged, he shall have the liberty to sail to another place or port which is free from ice and at which there are facilities for loading or discharging cargo and there await Charterer's further instructions. The whole of the time occupied from the time the Vessel is diverted by reason of ice or other conditions until her arrival at an ice-free port as well as any detention by reason of ice or any of the above causes shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

    14.    QUARANTINE.    (a)    Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay. The Owner shall be entitled to all the liberties specified in Clause 29.

    (b)    If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to the infected wharf he shall bear the expense of fumigation.

    15.    CLEANING. Prior to loading, Charterer shall inspect the designated tanks for the purpose of determining that they are in suitable condition for the loading and carriage of the cargo specified hereunder. Acceptance of the tanks by Charterer's representative shall be conclusive as to their suitability for such purposes. If Charterer's representative does not accept the tanks as suitable for the cargo, the Owner shall have the right, at its option, to cancel this Charter Party, without any resulting liability on the part of either party, or to again clean the tanks, subject to inspection as above.

    16.    HEATING.    (a)    If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested. Notwithstanding any other provisions herein the Owner shall not be responsible if such temperatures are not maintained by reason of any cause beyond the Owner's control and the laytime and demurrage provisions herein shall remain in full force and effect. The burden of proving the failure to exercise due diligence shall be on the Charterer or person claiming damage or other relief. Whenever the Owner's failure to maintain temperatures is excused under this or any other provision of this Charter, Charterer shall assume all risks of delay during discharge due to the nature or condition of the cargo and shall pay demurrage if any.

    (b)    Unless agreed to in writing by Owner, the Vessel is not under any obligation to heat the cargo, but Owner reserves the right to heat the cargo to facilitate discharge.

    (c)    If Charterer decides that heat ought to be applied to the cargo, Charterer's instructions to Owner will be in the following form: "Please instruct the Master _____ hours before arrival at discharge port to apply heat to cargo so that on arrival at discharge port the temperature about two feet above the coils shall be about ___ degrees Fahrenheit and to maintain approximately that temperature during discharge."

    17.    GENERAL EXCEPTIONS CLAUSE.    (a)    Neither the Vessel nor the Master or Owner shall be or shall be held liable for any loss of or damage or delay to the cargo or for any failure in performing hereunder arising or resulting from:--Any act, neglect or default of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; barratry; fire, unless caused by the personal design or neglect of the Owner; collision; stranding; perils, dangers or accidents of the seas or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk or any loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer, shipper, consignee, owner of the goods or holder of the bill of lading, their agents and representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, machinery, equipment or appurtenances; unseaworthiness of the Vessel whether existing at the beginning of the voyage or developing during the voyage unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped, and supplied; leakage; shrinkage; evaporation; change in quality of the cargo; handling or transportation losses; difference between actual or reported intake and out-turn quantities; stowage or contact with or leakage from other cargo; discoloration; contamination; deterioration; any consequence arising out of shipping more than one grade of cargo; or from any other cause arising without the actual fault or privity of the Owner. And neither the Vessel, her Master or Owner, nor the Charterer shall, unless otherwise in this Charter expressly provided, be responsible for any loss of or damage or delay to or failure to discharge or deliver the cargo arising or resulting from:--Act of God; act of war; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strikes, lockouts, stoppage or restraint of labor from whatever cause whether partial or general; or riot or civil

commotion. No exemption afforded the Charterer under this clause shall relieve the Charterer of or diminish its obligations for payment of any sums due the Owner under other provisions of this Charter.

(b)   The tanks having been inspected by the Charterer's inspector as to tightness and cleanliness, notwithstanding any other provision of this Charter, neither the Vessel nor the Owner shall be liable for loss or damage due to contamination, deterioration, discoloration or change in quality or characteristics, or leakage, unless there is negligence on the part of the Vessel.

18.   JASON CLAUSE. In the event of accident, danger, damage, or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which the Owner is not responsible by statute, contract, or other- wise, the cargo, shippers, consignees, or owners of the cargo shall contribute with the Owner in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the salving ship or ships belong to strangers.

19.   BOTH TO BLAME COLLISION CLAUSE. If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

20.   GENERAL AVERAGE. General average shall be adjusted, stated and settled, according to York-Antwerp Rules 1950, at such port or place in the United States as may be selected by the Owner, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York. In such adjustment, disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the Owner, must be furnished before delivery of the cargo. Such cash deposit as the Owner or his agents may deem sufficient as additional security for the contribution of the cargo and for any salvage and special charges thereon, shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owner before delivery. Such deposit shall, at the option of the Owner, be payable in United States money, and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the general average and refunds or credit balances, if any, shall be paid in United States money.

21.   DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel or stores at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

22.   OTHER PORTS. If this Charter Party is for a part cargo;--(a) Owner has the right, either before or after loading cargo covered by this Charter Party, to load or discharge cargo belonging to the Charterer or others in any ports, rotation of ports to be at Owner's option;

(b) Owner has privilege of discharging the cargo covered by this Charter Party at any port and to trans-ship it at Owner's risk and expense by any vessel or other means of transportation by water, or by rail, to the destination shown in Part I of this Charter Party.

23.   LIMITATION OF LIABILITY.   (a)   Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force. Nothing in this charter shall operate to limit or deprive the Owner of any statutory exceptions or limitation of liability on the theory of personal contract or otherwise.

(b)   The Owner and the Vessel in all matters arising under this Charter Party or any bill of lading issued hereunder shall be entitled to the like privileges, rights, and immunities as are contained in Sections 3 (6), 4, and 11 of the Carriage of Goods by Sea Act of the United States approved April 16, 1936.

(c)   Neither the Vessel or Owner, nor any corporation owned by, subsidiary to or associated or affiliated with the Vessel or Owner shall be liable to answer for or make good any loss or damage to the cargo occurring at any time and even though before loading on or after discharge from the Vessel, by reason or by means of any fire whatsoever, unless such fire shall be caused by the Owner's design or neglect.

24.   BILLS OF LADING. Bills of Lading in the form appearing below for cargo shipped shall be signed by the Master or Agent as requested. Any bill of lading signed by the Master or Agent of the Owner shall be without prejudice to the terms, conditions and exceptions of this Charter and shall be subject to all such terms, conditions and exceptions. The Charterer shall indemnify the Owner, the Master, and the Vessel from all consequences or liabilities that may arise from the Charterer or its agents or the Master or Vessel's agents signing bills of lading or other documents inconsistent with this Charter or from any irregularity in papers supplied by the Charterer or its agents, or from complying with any orders of the Charterer or its agents.

25.   LIEN. The Owner shall have an absolute lien on the cargo for all freight, dead freight, demurrage and costs, including attorney's fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any bills of lading covering the same, or of any storageman.

26.   AGENTS. The Owner shall appoint Vessel's agents at all ports.

27.   SUBSTITUTION. Owner has option to substitute another vessel provided she can report within the readiness and cancelling dates, and is suitable for the cargo, shown in Part I hereof.

28.   ASSIGNMENT. Subject to the approval of Owner, the Charterer shall have the option of subletting or assigning this Charter to any individual or company, but the Charterer shall always remain responsible for the due fulfillment of this Charter in all its terms and conditions.

29.   LIBERTY CLAUSES.   (a)   In any situation whatsoever and wheresoever occurring and whether existing or anticipated before commencement of or during the voyage, which in the judgment of the Owner or Master is likely to give rise to risk of capture, seizure, detention, damage, delay or disadvantage to or loss of the Vessel or any part of her cargo, or to make it unsafe, imprudent, or unlawful for any reason to commence or proceed on or continue the voyage or to enter or discharge the cargo at the port of discharge, or to give rise to delay or difficulty in arriving, discharging at or leaving the port of discharge or the usual place of discharge in such port, the Owner may before loading or before the commencement of the voyage, require the shipper or other person entitled thereto to take delivery of the cargo at port of shipment and upon their failure to do so, may warehouse the cargo at the risk and expense of the cargo; or the Owner or Master, whether or not proceeding toward or entering or attempting to enter the port of discharge or reaching or attempting to reach the usual place of discharge therein or attempting to discharge the cargo there, may discharge the cargo into depot, lazaretto, craft or other place; or the Vessel may proceed or return, directly or indirectly, to or stop at any such port or place whatsoever as the Master or the Owner may consider safe or advisable under the circumstances, and discharge the cargo, or any part thereof, at any such port or place; or the Owner or the Master may retain the cargo on board until the return trip or until such time as the Owner or the Master thinks advisable and discharge the cargo at any place whatsoever as herein provided or the Owner or the Master may discharge and forward the cargo by any means at the risk and expense of the cargo. The Owner may, when practicable, have the Vessel call and discharge the cargo at another or substitute port declared or requested by the Charterer. The Owner or the Master is not required to give notice of discharge of the cargo, or the forwarding thereof as herein provided. When the cargo is discharged from the Vessel, as herein provided, it shall be at its own risk and expense; such discharge shall constitute complete delivery and performance under this contract and the Owner shall be freed from any further responsibility. For any service rendered to the cargo as herein provided the Owner shall be entitled to a reasonable extra compensation.

(b)   The Owner, Master and Vessel shall have liberty to comply with any orders or directions as to loading, departure, arrival, routes, ports of call, stoppage, discharge, destination, delivery or otherwise howsoever given by the government of any nation or department thereof or any person acting or purporting to act with the authority of such government or of any department thereof, or by any committee or person having, under the terms of the war risk insurance on the Vessel, the right to give such orders or directions. Delivery or other disposition of the cargo in accordance with such orders or directions shall be a fulfillment of the contract voyage. The Vessel may carry contraband, explosives, munitions, warlike stores, hazardous cargo and may sail armed or unarmed and with or without convoy.

(c)   In addition to all other liberties herein the Owner shall have the right to withhold delivery of, reship to, deposit or discharge the cargo at any place whatsoever, surrender or dispose of the cargo in accordance with any direction, condition or agreement imposed upon or exacted from the Owner by any government or department thereof or any person purporting to act with the authority of either of them. In any of the above circumstances the cargo shall be solely at their risk and expense and all expenses and charges so incurred shall be payable by the owner or consignee thereof and shall be a lien on the cargo.

30.   PRIORITY.  All agreements of the Owner contained in this Charter Party shall be subject to any orders or instructions of priority or requisition issued by the United States Government or the Government of the flag of the Vessel or any agencies thereof, or the requirement of naval or military authorities or other agencies of Government.

31.   ARBITRATION.  Any dispute arising from the making, performance or termination of this Charter Party shall be settled in New York, Owner and Charterer each appointing an arbitrator, who shall be a merchant, broker or individual experienced in the shipping business; the two thus chosen, if they cannot agree, shall nominate a third arbitrator who shall be an Admiralty lawyer. Such arbitration shall be conducted in conformity with the provisions and procedure of the United States Arbitration Act, and a judgment of the Court shall be entered upon any award made by said arbitrator. Nothing in this clause shall be deemed to waive Owner's right to lien on the cargo for freight, dead freight or demurrage.

32.   APPROVAL.  If U. S. Government approval is required, this Charter Party is subject to that approval.

## BILL OF LADING

Shipped in apparent good order and condition by

on board the                                    Motorship/Steamship

Whereof                                    is Master at the port of

a quantity said to be                         pounds/tons/barrels/gallons of                         ,the quantity, measurement, weight, gauge, quality, nature, value and condition of the cargo are based on information given by the shipper and are unknown

to the Vessel and the Master, to be delivered at the port of                         or so near thereto as the Vessel can safely

get, always afloat, unto

or order on payment of freight at the rate of

This shipment is carried under and pursuant to the terms of the Charter dated

at                                                                    between

and                                                                                    as Charterer, and all the terms whatsoever
of the said Charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in
this shipment.

      If this Bill of Lading is a document of title to which the Carriage of Goods by Sea Act of the United States, approved April
16, 1936, or similar legislation giving statutory effect to the International Convention for the Unification of Certain Rules relating to
Bills of Lading at Brussels of August 25, 1924, applies by reason of the port of loading or discharge being in territory in which the said
Act or other similar legislation is in force, this Bill of Lading shall have effect subject to the provisions of the said Act or other similar
legislation, as the case may be, which shall be deemed incorporated herein, and nothing herein contained shall be deemed a surrender
by the carrier of any of its rights or immunities or an increase of any of it responsibilities or liabilities under said Act or other similar
legislation. If any term of this Bill of Lading is repugnant to the said Act or other similar legislation as so incorporated, such terms shall
be void to that extent but no further.

      In Witness Whereof, the Master has signed                                                    Bills of Lading of
this tenor and date, one of which being accomplished, the others will be void.

Dated at                                            this                                    day of

                                                                                          Master

                                                              or

                                                                                          As agents for the Master

                                                              By

This Charter Party is a computer generated copy of the VEGOILVOY form. It is a precise copy of the original document which can be modified,
amended or added to only by striking out of original characters, or the insertion of new characters, such characters clearly highlighted by underlining or
use of colour or use of a larger font and marked as having been made by the user and not by the author.

# EXHIBIT B

1



Gustav Heess Oleochemie GMBH

Invoice Date  3Aug2010
Invoice No  N8CHEM17/641
Our Reference  2010/665

Navig8 Chemicals Pool Inc.,
Trust Company Complex
Ajeltake Road, Ajeltake Island
Majuro, Marshall Islands    MH96960

## DEMURRAGE INVOICE

| | | | |
|---|---|---|---|
| *C/P Date:* | *18May2010* | *Voyage no.:* | 7 |
| *Vessel:* | *Songa Emerald* | | |
| *Charterer:* | *Gustav Heess Oleochemie GMBH* | | |
| *Fixture Ref.:* | *2010/665* | | |

**Note all values are in USD**

| | |
|---|---|
| Demurrage castor oil: Loading Kandla Discharging Rotterdam | 50,239.58 |
| **TOTAL** | **50,239.58** |

E. & O. E.

*PLEASE INDICATE OUR INVOICE NO., VESSEL NAME & VOYAGE NO. IN YOUR REMITTANCE ADVICE*

*PAYMENT TERMS:*
*PROMPT NET CASH BY TELEGRAPHIC TRANSFER OF IMMEDIATELY AVAILABLE FEDERAL FUNDS*
*\* WIRE TRANSFER ORIGINATOR TO DISCLOSE NECESSARY PARTICULARS TO COMPLY WITH MAS*
*(MONETARY AUTHORITY OF SINGAPORE) NOTICE 626 & COMPULSORY INTERNATIONAL*
*REGULATION*
CITIBANK,N.A., SINGAPORE BRANCH

ACCOUNT NO: 0-852726-016
BENEFICIARY NAME: NAVIG8 CHEMICALS POOL INC
SWIFT CODE: CITISGSG
BANK CODE: 7214, BRANCH CODE:001
BANK ADDRESS: TRANSACTION EXCHANGE CENTER, 3 TEMASEK AVENUE, #11-
00 CENTENNIAL TOWER, SINGAPORE 039190

CORRESPONDENT BANK: CITIBANK NY
CORRESPONDENT BANK SWIFT CODE: CITIUS33
ABA CODE FOR CITIBANK NY: 021000089

Laytime Calculation

## Laytime Calculation

| | | | |
|---|---|---|---|
| Vessel | Songa Emerald | Owner | Navig8 Chemicals Pool Inc - Brizo8 |
| Ref | Voyage 7 (2010/0665 VOY) | Charterer | Gustav Heess Oleochemie GMBH |
| CPDate | 18May2010 | Cargo | castor oil |
| Laycan | 25-30May10 | | |

---

Demurrage Terms          15,000 USD per Day (Not always on Demurrage)

### Loading Kandla

| | |
|---|---|
| Port | Load - Kandla castor oil 2,000.000 MT at 80.00 MT/h (SHINC) |
| B/L Date | 03Jun2010 |

| | | | |
|---|---|---|---|
| Arrived | 29May2010 10:30 | | |
| Time To Count From | 29May2010 11:00 | Time To Count To | 03Jun2010 06:00 |

---

### Discharging Rotterdam

| | |
|---|---|
| Port | Discharge - Rotterdam castor oil 2,000.000 MT at 120.00 MT/h (SHINC) |

| | | | |
|---|---|---|---|
| Arrived | 05Jul2010 00:45 | | |
| Time To Count From | 05Jul2010 04:45 | Time To Count To | 05Jul2010 20:40 |

---

| Day | Date | From | To | Description | Time | Pcnt | Laytime | Demurrage |
|---|---|---|---|---|---|---|---|---|
| | | | | Reversible Load: Kandla | | | | |
| Sat | 29May2010 | 11:00 | 17:00 | NOR | 06:00 | 0 | 00:00 | |
| Sat | 29May2010 | 17:00 | 24:00 | | 07:00 | 100 | 07:00 | |
| Sun | 30May2010 | 00:00 | 24:00 | | 24:00 | 100 | 24:00 | |
| Mon | 31May2010 | 00:00 | 10:40 | | 10:40 | 100 | 10:40 | |
| | | | | --- ON DEMURRAGE 31May2010 10:40 --- | | | | |
| Mon | 31May2010 | 10:40 | 24:00 | | 13:20 | 100 | | 13:20 |
| Tue | 01Jun2010 | 00:00 | 24:00 | | 24:00 | 100 | | 24:00 |
| Wed | 02Jun2010 | 00:00 | 13:23 | | 13:23 | 100 | | 13:23 |
| Wed | 02Jun2010 | 13:23 | 16:15 | Shifting to berth | 02:52 | 0 | 00:00 | |
| Wed | 02Jun2010 | 16:15 | 24:00 | | 07:45 | 100 | | 07:45 |
| Thu | 03Jun2010 | 00:00 | 06:00 | | 06:00 | 100 | | 06:00 |
| | | | | Reversible Discharge: Rotterdam | | | | |
| Mon | 05Jul2010 | 04:45 | 20:40 | | 15:55 | 100 | | 15:55 |

**Allowed Time Calculation**
```
  01:01:00 L/D Time Kandla
+ 00:16:40 L/D Time Rotterdam
= 01:17:40
```
**Total Time Used**
```
  04:10:08 Kandla
+ 00:15:55 Rotterdam
= 05:02:03
```

| | | | |
|---|---|---|---|
| DEMURRAGE | 3 Days 8 Hours 23 Mins (3.3493056) | Time Allowed | 01:17:40 |
| | at USD 15,000/d | Time Used | 05:02:03 |
| | = USD 50,239.58 | On Demurrage | 03:08:23 |

---

Generated by SoftMAR

# EXHIBIT C

# The Standard 

Phone:     (212) 809 8085
Email:     llambert@ctplc.com

August 6, 2012

**BY E-MAIL**
Gustav Hees Oleochemie GMBH
c/o Anwaltskanzlei Neugebauer & Coll.
Friedrich-List-Str. 46
D-70771 LE-Echterdingen
Attention: Guenther R. Negebauer

Re:   M/T SONGA EMERALD – C/P dd May 18, 2010 (Voy 07)
       Your ref: D40723-100530
       Our ref: 10/124951

Dear Sirs:

      We refer to previous correspondence.  As you are aware, we are agents for the managers of The Standard Club (Europe) Ltd and write on behalf of Navig8 Chemicals Pool Inc. ("Navig8"). Disputes have arisen under the referenced charter party between Navig8 and Gustav Hees Oleochemie GMBH ("Charterer"). Charterer, in breach of its duty under the charter, failed to pay for demurrage. The total presently in dispute is $50,239.58 plus interest and costs, including attorney and arbitrator fees. Navig8 has provided you their statement of claim.

      Disputes are subject to arbitration in New York pursuant to Clause 31 of the Vegoilvoy form.  Navig8 hereby demands arbitration in respect of these and any other disputes arising under the Charter and appoints Soren Wolmar as arbitrator, who is reading in copy.  Mr. Wolmar may be contacted c/o Quincannon Associates, Inc., Ten Rockefeller Plaza, Suite 1120, New York NY 10020, telephone:(212) 246-0060, e-mail: swolmar@quincannon.com.

      Kindly appoint Charterer's arbitrator within 20 days (on or before 26 August 2012).

                         Very truly yours,
                         LeRoy Lambert

cc:   Peter Seymour (by e-mail)
cc:   MSS Chartering Pvt. Ltd./Nikhil Mahendra (by e-mail)
cc:   Soren Wolmar (by e-mail)

**The Standard Steamship Owners' Protection and Indemnity Association (Europe) Limited**
www.standard-club.com
Incorporated in England No. 17864. Authorised and regulated by the UK Financial Services Authority

**Charles Taylor P&I Management (Americas), Inc** on behalf of the managers
75 Broad Street, Suite 2505, New York, NY 10004
Telephone: +1 212 809 8085  Fax: +1 212 968 1978  Email: p&i.newyork@ctcplc.com

# EXHIBIT D

| | |
|---|---|
| **From:** | LeRoy Lambert [LeRoy.Lambert@ctplc.com] |
| **Sent:** | Monday, September 10, 2012 12:41 PM |
| **To:** | 'wenzky@law-connection.de' |
| **Cc:** | 'mss@maansmarine.com'; Peter Seymour (Peter@navig8group.com); Becky Hamra |
| **Subject:** | RE: Songa Emerald - Navig8/Gustav Hees |
| **Attachments:** | Navig8 arbitration draft.pdf |

Dear Mr. Negebauer,

We refer to our message of 6 August and attached arbitration demand.   We are surprised that we have not received notice of the appointment of your client's arbitrator.

Your previous correspondence directed us to send all communications to you.

In any event, if we do not receive notice of the appointment of your arbitrator by close of business New York on Friday, 14 September 2012, we will turn the matter over to Navig8's lawyers who will ask the court in New York to appoint an arbitrator for Gustav Hees.   The cost of doing so, which could easily be $5-10,000, will be added to the principal amount of $50,239.58, and the arbitrators will be asked to include these costs in their award.

Regards,

LeRoy Lambert
President, Charles Taylor P&I Management (Americas), Inc
Charles Taylor P&I Management (Americas), Inc , on behalf of the managers of The Standard Club Europe Ltd
75 Broad Street, Suite 2505, New York, NY 10004
T: +1 646 753 9020 | M: +1 973 444 2683 | leroy.lambert@ctplc.com | www.standard-club.com

**From:** LeRoy Lambert
**Sent:** Monday, August 06, 2012 3:00 PM
**To:** wenzky@law-connection.de
**Cc:** mss@maansmarine.com; 'Soren Wolmar -'; Peter Seymour (Peter@navig8group.com); Becky Hamra
**Subject:** Songa Emerald - Navig8/Gustav Hees

Please pass the attached arbitration demand to Guenther R. Neugebauer.

Regards,

LeRoy Lambert
President, Charles Taylor P&I Management (Americas), Inc
Charles Taylor P&I Management (Americas), Inc , on behalf of the managers of The Standard Club Europe Ltd
75 Broad Street, Suite 2505, New York, NY 10004
T: +1 646 753 9020 | M: +1 973 444 2683 | leroy.lambert@ctplc.com | www.standard-club.com

The Standard Club Europe Ltd  Registered in England No. 17864. Authorised and regulated by the UK Financial Services Authority Managers' London Agents: Charles Taylor & Co. Limited. Registered in England No. 2561548
Charles Taylor & Co. Limited is an appointed representative of Charles Taylor Services Limited, which is authorised and regulated by the UK Financial Services Authority
Registered Address: Standard House, 12 - 13 Essex Street, London WC2R 3AA, UK